UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
Case No. :16-cv-        – Civil Class Action

JOHN PAOLETTI, individually and on behalf all others similarly situated,

    *Plaintiff*,

v.

EVERGLADES COLLEGE, INC., a Florida not-for-profit corporation, d/b/a KEISER UNIVERSITY,

    *Defendant*.
_____/

## CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL

Plaintiff John Paoletti ("Plaintiff" or "Paoletti") brings this Class Action Complaint and Demand for Jury Trial ("Complaint") against Everglades College, Inc., d/b/a Keiser University ("Keiser") to obtain redress for all persons injured by its unlawful telemarketing practices. Plaintiff alleges as follows upon personal knowledge as to himself and his own acts and experiences, and, as to all other matters, upon information and belief, including investigation conducted by his attorneys.

## NATURE OF THE ACTION

1. Keiser is a private university with over 20,000 students enrolled across dozens of campuses. Based on historical averages, more than 30% of these students will drop out before earning a degree.

2. To sustain this high-volume, high-turnover business model, Keiser operates aggressive telemarketing campaigns using computers with the capacity to machine-dial telephone numbers, in bulk, simultaneously and without human intervention.

3. Unfortunately, Keiser's telemarketing practices have violated the privacy of Plaintiff and the members of two putative classes of similarly situated individuals (the "Classes," defined below), who never provided their prior express consent to receive Keiser's calls.

4. Because Keiser uses automatic telephone dialing systems to call cellular telephone numbers, *en masse*, without the prior express consent of the call recipients, and because it does not honor requests to stop, it repeatedly violates the Telephone Consumer Protection Act, 47 U.S.C. § 227 (the "TCPA").

5. The TCPA was enacted to protect consumers from the unauthorized and repeated conduct alleged in this Complaint—autodialed telephone calls to cellphone numbers, placed without consent, and continued even after requests to stop.

6. Defendant's violations cause Plaintiff and the members of the putative Classes to experience actual harm, including violation of their statutory rights and the aggravation, nuisance, and invasion of privacy that necessarily accompanies the receipt of unsolicited and harassing telephone calls.

7. In response to Defendant's unlawful conduct, Plaintiff brings the instant lawsuit and seeks an injunction requiring Defendant to cease all unsolicited phone call activities, an award of statutory damages, costs, and reasonable attorneys' fees.

**PARTIES**

8. Plaintiff John Paoletti is a natural person and a citizen of the State of Florida.

9. Defendant Everglades College, Inc., d/b/a Keiser University is a not-for-profit corporation incorporated and existing under the laws of the State of Florida with its principal place of business located at 1900 W. Commercial Boulevard, Suite 180, Fort Lauderdale, Florida

33309. Defendant Keiser regularly conducts business throughout this District, the State of Florida, and the United States.

## JURISDICTION AND VENUE

10. This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331, as the action arises under the TCPA, a federal statute. This Court has personal jurisdiction over Defendant because Defendant conducts significant business in this District, solicits consumers in this District, maintains real estate in this District, and because it made and continues to make unsolicited calls in this District.

11. Venue is proper under 28 U.S.C. § 1391 because Defendant's principal place of business is in this District and because Plaintiff resides in this District. Additionally, the misconduct alleged in this Complaint occurred in and/or was directed from this District.

## COMMON FACTUAL ALLEGATIONS

12. For-profit colleges are notorious telemarketers. As one reporter described it:

> "To experience the frenzy of for-profit recruiting firsthand is enlightening and a little horrifying. . . . I have never been inundated by calls at the pace and level of intensity that I received one recent morning from for-profit college admissions officers.
>
> During an especially productive work session, I received a call on my work-issued cell phone at 9:12 from a young man asking to speak with Tiffany. I politely informed the caller that there was no one by that name in my office. I received another call for Tiffany at 9:14. I assumed the caller was an associate of the previous caller and chalked it up to persistence. At 9:15 when I received yet another call for Tiffany, my graduate education kicked in and I began to recognize a pattern . . . .
>
> I had similar conversations with the subsequent 19 admissions officers at 9:19, 9:22, 9:33, 9:41, 9:54, 9:58 . . . 12:27, at an average of seven calls per hour.
>
> My number appeared in an online database that services for-profit colleges by linking prospective students seeking information about educational opportunities to admissions offices. The company that manages the

3

database collects fees on a cost-per-lead basis. Tiffany must have mistakenly entered my phone number into this database. Between the two of us we generated 23 individual invoices in a little over three hours."[1]

13. These telemarketing practices are symptomatic of an industry where the culture is "to enroll students at any costs."[2] For-profit colleges "are basically marketing machines . . . [t]hey're not really educational providers." *Id*.

14. Keiser University is one of the higher education industry's telemarketing success stories. Founded in 1977 by Arthur Keiser as a for-profit "career college,"[3] Keiser has successfully marketed itself into an educational behemoth with more than 20 campuses and over 20,000 actively enrolled students, many of whom will pay tens of thousands of dollars before leaving without degrees.

15. On paper, however, Keiser has recently restructured itself as a "nonprofit." Specifically, in November of 2010, the Florida Attorney General added Keiser to its general investigation into the practices of for-profit colleges, alleging potential "unfair/deceptive practices regarding recruitment, enrollment, placement, etc."[4]

---

[1] Inside Higher Ed, *Essay on Being on Receiving End of Telemarketing for Higher Education*, available at https://www.insidehighered.com/views/2011/03/08/essay_on_being_on_ receiving_end_of_telemarketing_for_for_profit_higher_education (last accessed July 25, 2016).
[2] Pro Publica, *Recruiter's Experience at one For-Profit University Suggests Reform Efforts Will Face Hurdles*, available at https://www.propublica.org/article/recruiters-experience-at-one-for-profit-university-suggests-reform-efforts- (last visited July 25, 2016).
[3] TheLedger, *Keiser University: Nonprofit Operation Advantageous*, available at http://www.theledger.com/article/20110122/EDIT01/101225003?p=all&tc=pgall (last visited April 18, 2016).
[4] Tampa Bay Times, *Florida Attorney General's Office Now Investigating Eight For-Profit Colleges*, available at http://www.tampabay.com/news/education/college/florida-attorney-generals-office-now-investigating-eight-for-profit/1136857 (last accessed July 25, 2016).

4

16.     In response, just three months later, Defendant Keiser University sold itself to Everglades College, Inc., a "nonprofit" entity created by the Keiser family, using a loan from Arthur Keiser himself. According to the Miami Herald:

> "Keiser's nonprofit conversion was achieved by Arthur Keiser selling the for-profit Keiser University to a smaller nonprofit controlled by the Keiser family, Everglades College Inc.
>
> Essentially, Keiser sold the left hand of his empire to the right hand. To pay for it all, Keiser made a $300 million loan to himself, and he's now paying it back with college revenue—with interest.
>
> Records show that Keiser's 2012 compensation as college president for the combined Everglades/Keiser schools was $855,842. The records also show that 10 of the nonprofit's campuses are paying rent to companies in which Arthur Keiser has an ownership interest.
>
> The combined rent for those properties: about $14.6 million."[5]

17.     Now, "[a]s president of Everglades, Arthur Keiser earns a salary of nearly $856,000, more than his counterpart at Harvard, and is receiving payments and interest on more than $321 million he lent the tax-exempt nonprofit so that it could buy his university. And he has an ownership interest in properties that the college pays $14.6 million in rent for, as well as a stake in the charter airplane that the college's managers fly in and the Holiday Inn where its employees stay."[6]

---

[5] Miami Herald, *Not-for-Profit but Still Lucrative*, available at http://www.miamiherald.com/news/local/education/article19383987.html#storylink=cpyaccording (last accessed July 25, 2016).

[6] New York Times, *Some Owners of Private Colleges Turn a Tidy Profit by Going Nonprofit*, available at http://www.nytimes.com/2015/03/03/business/some-private-colleges-turn-a-tidy-profit-by-going-nonprofit.html?_r=0 (last accessed July 25, 2016).

18. Accordingly, as noted by Arthur Keiser himself, little has changed: Defendant Keiser University is still "operating in the same way, with the same people; the only difference is that it's owned by a nonprofit."[7]

19. One thing that has not changed is Keiser's telemarketing practices. Like its competitors, Keiser effectuates telemarking campaigns using hundreds of "admissions counselors" who "dial scores of prospective students each day from a list of telemarketing leads and entice them to enroll[.]"[8] Keiser employs over 350 of these recruiters (specifically, it employs approximately three recruiters for every one of its student services employees).

20. Many of these recruiters, often originally thinking that they would be "admissions counselors" in the traditional sense, now complain of their incessant telemarketing duties:[9]

---

★★★★★ ▼ **glorified telemarketer**

Admissions Counselor (Former Employee) – Melbourne, FL – January 17, 2016

you are told in the interview that you will be advising students 1 on 1; but it is mostly making outbound calls ; 80 t0 100 per day; you feel like a glorified telemarketer; required to be responsible for every part of admitting a student including financial aid which should be their responsibility; everyting falls back on admissions counselor- good or bad; must know every aspect of all the programs; kind of learn as you go after basic training; rules change and programs change constantly;praised if you make the goals; treated like a failure if not. coworkers are nice, but you work in a stuffy, dusty cubicle with no natural light or outside view. building is old and musty - will work everyday before and after a holiday and saturdays including christmas eve, day after christmas, nye, day after new years; MLK, labor day etc; you might get to go home early but wont find out until that day so you can not plan ahead. not allowed overtime, can not take time off until you earn PTO; must work 2 nights a week until 8 which makes 10 or 11 hour day. if you work sat you have to flex time ; can not exchange for day off during week; can not leave early on req late night or friday.

---

(Figure 1.) (Making "80 to 100" outbound calls per day.)

---

[7] Miami Herald, *Keiser: Not-for-Profit but Still Lucrative*, available at http://www.miamiherald.com/news/local/education/article19383987.html (last accessed July 25, 2016).

[8] See *The High Price of For-Profit Colleges*, AAUP, http://www.aaup.org/article/high-price-profit-colleges#.Vvm30WQrIfE (last visited April 18, 2016).

[9] Figures 1-3 are job reviews posted at Indeed, *Keiser University Reviews*, available at http://www.indeed.com/cmp/Keiser-University/reviews (last accessed July 25, 2016).

> ★☆☆☆☆ ▼   **The worse place to work EVER!!!**
>
> High School Admissions Counselor (Former Employee) – Fort Lauderdale, FL – September 14, 2012
>
> When you think admissions counselor, you would think counseling students, right? Nope not at Keiser! This is a sales job. You are selling these students fake dreams. As much as they say u are helping them u are not. All they care about is how many calls u make and how many appointments you have. U contact the same leads everyday and most don't even answer because their tired of being harrassed. The cost to attend is ridiculous and they would throw u in any program just to get an enrollment. If you do not get those enrollments you will be let go. Management does not care about u their only there to make themselves look good. This school is a rip off and I will never recommend any student to attend much less any one to work as a admissions counselor.

(Figure 2.) (Employees "contact the same leads everyday" who are "tired of being harassed.")

> ★☆☆☆☆ ▼   **The worst company you will ever work for!**
>
> Admissions Counsoler (Former Employee) – Port St Lucie Fl – September 11, 2012
>
> I was COMPLETLEY mislead about this position, this is a SALES job. I was told I would be "counseling" students and help them "change their life" by enrolling into Kesier but in reality all I was doing was putting these people into massive DEBT with no chance of employment when they graduate. Two weeks before I left the school laid off 6 people from admissions and after that the DOA had the NERVE to talk about how strong of an institution it was!!!!! She basically said we should feel privileged to work at such an amazing place....wake up from you dream world Dr.DOA and realize what is going on around you!!!!!! Your goal is 100 calls a day to "leads" that have already been called 15 times already. This place is a JOKE! The atmosphere in the office is one that feels like a jail cell! You are hovered on all day long by the assistant DOA who is extremely RUDE and watched every move you make. The only counsolers who are allowed to speak are the "senior" ones who get personal phone calls all the time, play on there cell phones all day, and talk about how many women they are going to hook up with this weekend. It's disgusting!! What is also disgusting is how Dr.DOA litteralty throws herself at them!! It's all around a horrible environment and I understand sometimes things are sugarcoated by potential employers but I have never seen anything like this!!! DO NOT WORK HERE!!!!!

(Figure 3.) (Noting goal of "100 calls a day" to leads who have "already been called 15 times.")

21.     Consumers, as well, lament Keiser's incessant telemarking practices, as evidenced by legions of online complaints:[10]



(Figure 4.)



(Figure 5.)



(Figure 6.)

---

[10]     The online complaints are scathing and too numerous to quote. Figures 4-8 represent a small sample from just one website, *http://800notes.com* (last accessed July 25, 2016).



(Figure 7.)



(Figure 8.)



(Figure 9.)

22. Ultimately, Defendant Keiser's longstanding and aggressive telemarketing practices have resulted in countless unwanted telephone calls placed to consumers, thousands of which were placed in violation of the TCPA.

23. Defendant knowingly made, and continues to make, unlawful telemarketing calls without the prior express consent of the call recipients, and knowingly continues to place such calls even after receiving requests to stop. In so doing, Defendant not only invades the personal privacy of Plaintiff and members of the putative Classes, but also intentionally and repeatedly violates the TCPA.

## FACTS SPECIFIC TO PLAINTIFF PAOLETTI

24. Plaintiff subscribes to a private cellular telephone number.

25. Plaintiff registered his private cellphone number with the National Do Not Call Registry on March 9, 2014, for the specific purpose of avoiding unwanted telemarketing calls like those alleged in this Complaint.

26. Nonetheless, starting in 2014 and continuing for years, Defendant Keiser has called Plaintiff, without his consent, multiple times per week (and as many as three times per day), using the phone number (561) 471-6000.

27. Each time Plaintiff received one of Defendant's calls, he would say "hello" multiple times before being connected with one of Defendant's "admissions counselors."

28. Defendant's admission counselors would then attempt to entice Plaintiff to enroll at Keiser University.

29. Plaintiff was not then, nor is he now, interested in pursuing any secondary education, let alone pursuing such an education at Keiser University.

30. Plaintiff repeatedly told Defendant's admissions counselors that he was 50 years old and not at all interested in enrolling in any school, let alone Keiser University, and repeatedly demanded that Defendant stop placing calls to his private cellular telephone.

31. Despite Plaintiff's repeated demands, Defendant continued to place telephone calls to Plaintiff's private cellular telephone.

32. As a result of Defendant's intrusive calls, Plaintiff suffered harms, including the violation of his statutory rights as well as the aggravation, nuisance, and invasion of privacy that necessarily accompanies the receipt of unsolicited and harassing commercial telephone calls.

33. Defendant is and was aware that the above-described telephone calls were and are being made, using an automatic telephone dialing system, to the cellphone numbers of consumers like Plaintiff who had not provided express consent to receive them.

## CLASS ACTION ALLEGATIONS

34. Plaintiff brings this action on behalf of himself and two classes defined as follows (the "Classes"), pursuant to Fed. R. Civ. P. 23(b)(2) and Fed. R. Civ. P. 23(b)(3):

> **Autodialer Class**: All individuals in the United States who (1) received a call placed by or on behalf of Defendant; (2) on his or his cellular telephone number; (3) that was placed using an automated or computerized dialing system; and (4) where Defendant had no record of express consent to place such call.
>
> **Do-Not-Call Class**: All individuals in the United States who (1) received a call placed by or on behalf of Defendant; (2) on his or his cellular telephone number; (3) that was placed using an automated or computerized dialing system; and (4) that was placed after Defendant created a record reflecting a do-not-call request for that called cellular telephone number.

The following people are excluded from the Classes: (1) any Judge or Magistrate presiding over this action and members of their families; (2) Defendant, Defendant's subsidiaries, parents, successors, predecessors, and any entity in which the Defendant or its parents have a controlling interest and its current or former employees, officers and directors; (3) persons who properly execute and file a timely request for exclusion from the Classes; (4) persons whose claims in this matter have been finally adjudicated on the merits or otherwise released; (5) Plaintiff's counsel and Defendant's counsel; and (6) the legal representatives, successors, and assigns of any such excluded persons.

35. **Numerosity**: The exact sizes of the Classes are unknown and not available to Plaintiff at this time, but it is clear that individual joinder is impracticable. On information and belief, Defendant made telephone calls to hundreds or even thousands of consumers who fall into the definition of the Classes. Members of the Classes can be easily identified through Defendant's records.

36. **Commonality and Predominance**: There are many questions of law and fact common to the claims of Plaintiff and the Classes, and those questions predominate over any questions that may affect individual members of the Classes. Common questions for the Classes include, but are not necessarily limited to, the following:

    (a)    Whether Defendant systematically made telephone calls to the cellular telephone numbers of the members of the Classes;

    (b)    Whether Defendant systematically placed these calls through the use of an automatic telephone dialing system;

    (c)    Whether Defendant had express consent to make these telephone calls at the times such calls were made;

    (d)    Whether Defendant's conduct violated TCPA; and

    (e)    Whether the willfulness of Defendant's conduct entitles members of the Classes to treble damages.

37. **Typicality and Adequacy of Representation**: Plaintiff's claims are virtually identical to those of the other members of the Classes. Plaintiff will fairly and adequately represent and protect the interests of the Classes, and has retained counsel competent and experienced in complex class actions. Plaintiff has no interests antagonistic to those of the Classes, and Defendant has no defenses unique to Plaintiff. Plaintiff and his counsel are committed to vigorously prosecuting this action on behalf of the members of the Classes, and have the financial resources to do so. Neither Plaintiff nor his counsel have any interest adverse to the Classes.

38. **Superiority**: This class action is also appropriate for certification because Defendant has acted or refused to act on grounds generally applicable to the Classes as a whole, thereby requiring the Court's imposition of uniform relief to ensure compatible standards of conduct toward the members of the Classes and making final class-wide injunctive relief

appropriate. Defendant's business practices apply to and affect the members of the Classes uniformly, and Plaintiff's challenge of those practices hinges on Defendant's conduct with respect to the Classes as a whole, not on facts or law applicable only to Plaintiff. Moreover, membership in the Classes can be ascertained from objective information contained in Defendant's records. Additionally, the damages suffered by individual members of the Classes will likely be small relative to the burden and expense of individual prosecution of the complex litigation necessitated by Defendant's actions. Thus, it would be virtually impossible for the members of the Classes to obtain effective relief from Defendant's misconduct on an individual basis. A class action provides the benefits of single adjudication, economies of scale, and comprehensive supervision by a single court. Economies of time, effort, and expense will be fostered and uniformity of decisions will be ensured.

**FIRST CAUSE OF ACTION**
**Violation of 47 U.S.C. § 227**
**(On behalf of Plaintiff and the Autodialer Class)**

39. Plaintiff restates the allegations of paragraphs 1 through 38.

40. Defendant and/or its agents, in efforts to promote Defendant's institution, placed unsolicited and unwanted telemarketing calls to cellular telephone numbers belonging to Plaintiff and the other members of the Autodialer Class.

41. Defendant placed these calls using equipment that had the capacity to store or produce telephone numbers using a random or sequential number generator and/or the capacity to receive and store lists of phone numbers, and to dial such numbers, *en masse*, without any need for human intervention.

42. Defendant placed these telemarketing calls without first having records of prior express consent from Plaintiff or the members of the Autodialer Class to make such calls.

43.     By placing such calls to the cellular telephone numbers of Plaintiff and the Autodialer Class members without first having prior express consent to do so, and by placing such calls while using equipment with the capacity to store or produce telephone numbers using a random or sequential number generator and/or with the capacity to receive and store lists of phone numbers, and to dial such numbers, *en masse*, Defendant violated 47 U.S.C. § 227(b)(1)(A)(iii).

44.     As a result of Defendant's unlawful conduct, Plaintiff and the members of the Autodialer Class suffered actual damages in the forms of invasions of their privacy and of monies paid or minutes lost to receive the unsolicited telephone calls on their cellular phones. Under 47 U.S.C. § 227(b)(3), Plaintiff and the members of the Autodialer Class are each entitled to, *inter alia*, a minimum of $500 in damages for each such violation of the TCPA.

45.     To the extent Defendant's misconduct is determined to be willful and knowing, the Court should, pursuant to 47 U.S.C. § 227(b)(3), treble the amount of statutory damages recoverable by Plaintiff and the other members of the Autodialer Class.

**SECOND CAUSE OF ACTION**
**Violation of 47 U.S.C. § 227**
**(On behalf of Plaintiff and the Do-Not-Call Class)**

46.     Plaintiff restates the allegations of paragraphs 1 through 38.

47.     Defendant and/or its agents, in efforts to promote Defendant's institution, placed unsolicited and unwanted telemarketing calls to cellular telephone numbers belonging to Plaintiff and the other members of the Do-Not-Call Class.

48.     Defendant placed these calls using equipment that had the capacity to store or produce telephone numbers using a random or sequential number generator and/or the capacity

to receive and store lists of phone numbers, and to dial such numbers, *en masse*, without any need for human intervention.

49. Defendant placed these telemarketing calls despite having records showing do-not-call requests made by Plaintiff and the members of the Do-Not-Call Class.

50. By placing such calls to the cellular telephone numbers of Plaintiff and the Do-Not-Call Class members without having their express consent to do so, and by placing such calls while using equipment with the capacity to store or produce telephone numbers using a random or sequential number generator and/or with the capacity to receive and store lists of phone numbers, and to dial such numbers, *en masse*, Defendant violated 47 U.S.C. § 227(b)(1)(A)(iii).

51. As a result of Defendant's unlawful conduct, Plaintiff and the members of the Do-Not-Call Class suffered actual damages in the forms of invasions of their privacy and of monies paid or minutes lost to receive the unsolicited telephone calls on their cellular phones. Under 47 U.S.C. § 227(b)(3), Plaintiff and the members of the Do-Not-Call Class are each entitled to, *inter alia*, a minimum of $500 in damages for each such violation of the TCPA.

52. To the extent Defendant's misconduct is determined to be willful and knowing, the Court should, pursuant to 47 U.S.C. § 227(b)(3), treble the amount of statutory damages recoverable by Plaintiff and the other members of the Do-Not-Call Class.

### PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff John Paoletti, individually and on behalf of the Classes, prays for the following relief:

1. An order certifying the Classes as defined above, appointing Plaintiff John Paoletti as the representative of the Classes, and appointing his counsel as Counsel for the Classes;

2.     An award of actual and statutory damages;

3.     An injunction requiring Defendant to cease all unsolicited telephone calling activities, and otherwise protecting the interests of the Classes;

4.     An award of reasonable attorneys' fees and costs; and

5.     Such other and further relief that the Court deems reasonable and just.

## JURY DEMAND

Plaintiff requests a trial by jury of all claims that can be so tried.

Respectfully submitted,

**JOHN PAOLETTI**, individually and on behalf of all others similarly situated,

Dated: July 25, 2016         By: /s/ David P. Healy
                                  One of Plaintiff's attorneys.


David P. Healy (Florida Bar No. 940410)
dhealy@davidhealylaw.com
DUDLEY, SELLERS, HEALY & HEATH, PLC
SunTrust Financial Center
3522 Thomasville Road, Suite 301
Tallahassee, Florida 32309
Tel: 850.222.5400
Fax: 850.222.7339

Benjamin H. Richman*
brichman@edelson.com
Elizabeth A. Winkowski*
ewinkowski@edelson.com
EDELSON PC
350 North LaSalle Street, 13th Floor
Chicago, Illinois 60654
Tel: 312.589.6370
Fax: 312.589.6378

Jarrett L. Ellzey*
jarrett@hughesellzey.com
HUGHES ELLZEY, LLP
Galleria Tower I
2700 Post Oak Blvd., Ste. 1120
Houston, Texas 77056
Tel: 713.554.2377
Fax: 888.995.3335

**Pro hac vice* admission to be sought.

*Attorneys for Plaintiff and the Putative Classes*

17